**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| KEVIN CLARKE, TREVOR BOECKMANN, HARRY CRANE, CORWIN SMIDT, PREDICT IT, INC., ARISTOTLE INTERNATIONAL, INC., MICHAEL BEELER, MARK BORGHI, RICHARD HANANIA, JAMES MILLER, JOSIAH NEELEY, GRANT SCHNEIDER, and WES SHEPHERD, <br><br>*Plaintiffs*, <br><br>v. <br><br>COMMODITY FUTURES TRADING COMMISSION, <br><br>*Defendant*. | Civil Docket No. 1:22-cv-00909-LY <br><br> The Honorable Lee Yeakel |

**REPLY IN SUPPORT OF DEFENDANT CFTC'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................................. 1

ARGUMENT ..................................................................................................................................... 2

    I.      Plaintiffs' Scattershot "Final Agency Action" Theories Are Wrong............................ 2

          a.   *Chicago Board of Trade* and *Kixmiller* are not distinguishable. ................................................................................... 2

          b.   The Staff-level 2014 no-action letter is not a "license." ............................. 2

          c.   The August 4, 2022 withdrawal is not an "unappealable" mandate" and no hypothetical enforcement action hinges on a "date certain." .................................................................................. 4

          d.   The Commission itself never "approved" either staff letter. ....................... 6

          e.   Nor has the Commission "delegated" any "approval" authority to Staff issuing no-action letters. ................................................ 8

          f.   Staff no-action letters are not "Commission orders" with legal consequences........... 8

    II.     Staff Decisions Whether To Recommend Enforcement Proceedings Are No Less "Committed To Agency Discretion By Law" Than Commission Decisions Authorizing Or Declining To Authorize Enforcement Proceedings............ 9

    III.    The Amended Complaint Does Not Plausibly Allege Article III Standing................ 10

CONCLUSION................................................................................................................................ 10

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Apache Corp. v. Chevedden*,
   696 F. Supp. 2d 723 (S.D. Tex. 2010) ........................................................................................ 9

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................................................. 6, 10

*Chicago Bd. of Trade v. SEC*,
   883 F.2d 525 (7th Cir. 1989) ............................................................................................. 2, 7, 9

*Frozen Food Express v. United States*,
   351 U.S. 40 (1956) ................................................................................................................. 8, 9

*Holistic Candlers & Consumers Ass'n v. FDA*,
   664 F.3d 940 (D.C. Cir. 2012) ................................................................................................... 5

*Kixmiller v. SEC*,
   492 F.2d 641 (D.C. Cir. 1974) ................................................................................................ 2, 7

*Luminant Generation Co. v. EPA*,
   757 F.3d 439 (5th Cir. 2014) .................................................................................................. 5, 9

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*,
   443 F.2d 689 (D.C. Cir. 1971) ................................................................................................... 4

*Nat'l Wrestling Coaches Assoc. v. Dep't of Educ.*,
   366 F.3d 930 (D.C. Cir. 2004) ................................................................................................. 10

*Soundboard Ass'n v. FTC*,
   888 F.3d 1261 (D.C. Cir. 2018) ................................................................................................. 5

*Sprint Nextel Corp. v. FCC*,
   508 F.3d 1129 (D.C. Cir. 2007) ................................................................................................. 7

*Taylor-Callahan-Coleman Cntys. Dist. Adult Prob. Dep't v. Dole*,
   948 F.2d 953 (5th Cir. 1991) ..................................................................................................... 4

*Texas v. EEOC*,
   933 F.3d. 433 (5th Cir. 2019) ................................................................................................. 3, 5

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ................................................................................................................ 10

*W. Illinois Home Health Care, Inc. v. Herman*,
   150 F.3d 659 (7th Cir. 1998) .................................................................................... 5

**Statutes:**

Administrative Procedure Act:
   5 U.S.C. § 551(8) ...................................................................................................... 2
   5 U.S.C. § 701(a)(2) ................................................................................................. 9

Commodity Exchange Act
   7 U.S.C. § 2(a)(6) ..................................................................................................... 6
   7 U.S.C. § 6(c)(1)–(2) .............................................................................................. 7
   7 U.S.C. § 7(a) .......................................................................................................... 7
   7 U.S.C. § 7b-3(a)(1) ............................................................................................... 7
   7 U.S.C. § 13(5) ....................................................................................................... 9

15 U.S.C. § 78y(a)(1) ..................................................................................................... 2

28 U.S.C. § 1746(1) .................................................................................................... 10

**Rules and Regulations:**

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 10

CFTC Regulations:
   17 C.F.R. § 37.3 ....................................................................................................... 7
   17 C.F.R. § 38.3 ....................................................................................................... 7
   17 C.F.R. § 140.12 ............................................................................................... 5, 6
   17 C.F.R. § 140.99 ............................................................................................... 8, 9
   17 C.F.R. § 140.99(a)(1) ...................................................................................... 2, 3
   17 C.F.R. § 140.99(a)(2) ....................................................................... 1, 3, 4, 5, 6, 8

*Requests for Exemptive, No-Action and Interpretive Letters*,
   63 Fed. Reg. 3285 (Jan. 22, 1998) ........................................................................... 8

*Requests for Exemptive, No-Action and Interpretive Letters*,
   63 Fed. Reg. 68,175 (Dec. 10, 1998) ................................................................... 2–3

**INTRODUCTION**

Plaintiffs' opposition resorts to hyperbole and mischaracterization to try to persuade this Court that a 2014 no-action letter written by agency staff, which by its express terms was not binding on the Commission, was an "approval" or "license" to operate, and staff's withdrawal of that letter was an "unappealable mandate" issued by "the Commission itself." Plaintiffs purportedly seek reinstatement of the 2014 no-action letter, but that letter had only one effect: providing that certain CFTC staff would not recommend that the Commission bring an enforcement action if certain conditions were met. Reinstating that no-action position now would *not* create any "license" or "approval" either; the Commission can bring an enforcement action with or without the recommendation of its staff. Plaintiffs' arguments cannot be squared with either the text or legal significance of the 2014 no-action letter, the August 4, 2022 withdrawal, or the regulation under which the letters were issued, 17 C.F.R. § 140.99(a)(2). Despite Plaintiffs' outrage, settled APA case law calls for dismissal on the pleadings.

In a further rhetorical exercise, Plaintiffs repeatedly denigrate the CFTC's motion as seeking to "evade accountability" by focusing on "a series of technical arguments." But final agency action, the exercise of prosecutorial discretion, and Article III standing are not mere technicalities. This case is a prime example why. Plaintiffs rushed to Court to challenge the informal and interlocutory expression of the circumstances under which particular staff may (or may not) choose to recommend an enforcement action, before any independent and discretionary Commission-level decision has been made. Plaintiffs' position, if accepted, would upend the staff no-action process, potentially depriving others the very same opportunity to obtain the benefits of informal guidance from CFTC staff that Victoria University itself elected in 2014.

This Court can and should dismiss this case now for these threshold failures.

1

**ARGUMENT**

I.     **Plaintiffs' Scattershot "Final Agency Action" Theories Are Wrong.**

    a.   *Chicago Board of Trade* **and** *Kixmiller* **are not distinguishable.**

The Seventh and D.C. Circuits have unanimously and persuasively held that directly analogous SEC no-action letters are not judicially reviewable.[1] *See generally Bd. of Trade of City of Chicago v. SEC*, 883 F.2d 525 (7th Cir. 1989); *Kixmiller v. SEC*, 492 F.2d 641 (D.C. Cir. 1974) (per curiam). Plaintiffs attempt to distinguish those cases as presenting "entirely different" factual circumstances, in that the August 4, 2022 withdrawal is "mandating future action together with a threat of future enforcement." Dkt. 21 at 12–13. That is, Plaintiffs do not challenge *Chicago Board of Trade* and *Kixmiller* but instead argue that the 2014 no-action letter, unlike other no-action letters, was a "license" whose "revocation" is an "unappealable mandate" that was "approved" by the Commission and issued by staff under specifically "delegated" authority.

For the following reasons, Plaintiffs' theory of the case is simply wrong.

    b.   **The Staff-level 2014 no-action letter is not a "license."**

Plaintiffs' Amended Complaint rests on the faulty premise, among others, that staff no-action letters are "licenses" for APA purposes because they reflect "a formal process—provided by agency regulations—where a division of the CFTC has delegated authority to allow a private party to skip certain regulatory steps." *See* Dkt. 21 at 15–18; 5 U.S.C. § 551(8).

Plaintiffs appear to be describing Rule 140.99(a)(1) exemptive letters, which have no application to this case. *See generally Requests for Exemptive, No-Action and Interpretive*

---

[1] In a footnote, Plaintiffs assert that *Kixmiller* did not "assess[] … final agency action under the APA." *See* Dkt. 21 at 13 n.2. While it is true that *Kixmiller*—and *Chicago Board of Trade*—involved a specialized review applicable to "final order[s] of the [Securities & Exchange] Commission," 15 U.S.C. § 78y(a)(1), both courts applied general APA standards when assessing the relevant "finality" and the "committed to agency discretion" inquiries. *See, e.g.*, *Kixmiller*, 492 F.2d at 644–645 & nn.24, 27; *Chicago Bd. of Trade*, 883 F.2d at 529–531.

2

*Letters*, 63 Fed. Reg. 68,175, 68,175–176 (Dec. 10, 1998). Exemptive letters reflect a "written grant of relief" from "the staff of a Division" pursuant to certain narrow categories of "exemptive authority" that have specifically "been delegated by the Commission to the Division in question." 17 C.F.R. § 140.99(a)(1). To be clear, Victoria University never sought and was never granted a Rule 140.99(a)(1) exemptive letter.

DMO's letters here were issued under Rule 140.99(a)(2). Such no-action letters reflect only "a written statement" that the issuing staff "will not recommend enforcement action to the Commission." *Id.* § 140.99(a)(2). Under Rule 140.99(a)(2)'s express terms, the Commission has not delegated any CEA authority and no-action letters, issued at staff's discretion, "bind[] only the issuing" staff "and not the Commission or other Commission staff." *Id.*

The 2014 no-action letter was nothing more than a statement by DMO staff "not to recommend an enforcement action" to the Commission if certain conditions were met—and by definition, that is the full no-action position issuing staff can take. Plaintiffs do not identify any delegation from the Commission to DMO staff to issue any "approvals" concerning PredictIt. Nevertheless, Plaintiffs maintain that the letter was "a CFTC approval to establish the PredictIt Market." Dkt. 21 at 16. On its face, the 2014 letter confirms that no such "CFTC approval to establish the PredictIt Market" ever existed. *See, e.g.*, Am. Compl. Ex. 1 at 5–6 (reiterating that "[t]his letter, and the no-action position taken herein, represents the views of DMO only").[2]

Thus, contrary to Plaintiffs' characterizations, this is not a case in which the "agency" ever "allow[ed] an entity to comply with modified administrative requirements or to avoid them altogether." Dkt. 21 at 16. The cases cited by Plaintiffs addressing "approvals" and "licenses"

---

[2] For the same reasons, Plaintiffs' assertion that the 2014 no-action letter established a Commission "safe harbor" insulating PredictIt's operations has no merit. Dkt. 21 at 15 (citing *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019)).

3

in unrelated contexts issued by other agencies under distinct legal authority are therefore inapposite because they do not involve informal staff-level recommendations. *Cf.* Dkt. 21 at 16–17. Plaintiffs also fail to distinguish *Sheridan Kalorama Historical Association v. Christopher*'s discussion of the outer limits of the APA's "license" definition as requiring affirmative approval or similar grant of permission because, again, the Commission did not "expressly allow" anything. *See* Dkt. 21at 17 n.3 (citing 49 F.3d 750 (D.C. Cir. 1995)).

Moreover, Plaintiffs offer no limiting principle on their radical "license" definition. Plaintiffs simply assert that the 2014 no-action letter is somehow unique among CFTC staff no-action letters. If, for the first time ever, a staff-level no-action position is held to be a Commission-authorized "license" subject to APA litigation, that valuable channel for informal communication with agency staff would all but be eviscerated. *See Taylor-Callahan-Coleman Cntys. Dist. Adult Prob. Dep't v. Dole*, 948 F.2d 953, 958–959 (5th Cir. 1991) (citing *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 699 (D.C. Cir. 1971)).

    **c. The August 4, 2022 withdrawal is not an "unappealable mandate" and no hypothetical enforcement action hinges on a "date certain."**

Plaintiffs characterize the August 4, 2022 withdrawal letter as an "unappealable mandate … coupled with a threat of enforcement" that contains unambiguous "instruction to liquidate Market contracts by a date certain" entailing "real-world effect." *See* Dkt. 21 at 8, 12.

Once again, Plaintiffs fundamentally misstate the matter. All the August 4, 2022 withdrawal does—and all it can legally do under Rule 140.99(a)(2)—is formally "withdraw" the 2014 no-action letter. Am. Compl. Ex. 2 at 2. In turn, all the 2014 no-action letter did—and all that it could have done under Rule 140.99(a)(2)—was provide that "DMO will not recommend that the Commission take any enforcement action." Am. Comp. Ex. 1 at 5. Taken together, that means that the August 4, 2022 withdrawal merely rescinds DMO's earlier statement that DMO

4

would "not recommend that the Commission take any enforcement action." Plaintiffs do not allege that DMO has recommended an enforcement action, nor did DMO even commit to doing so if the February 2023 grace period is not observed. Instead DMO stated that PredictIt "should" comply and implies, if not, DMO *might* make a recommendation. *See* Am. Compl. Ex. 2 at 2.[3]

The *only* legal difference after the withdrawal is that DMO may choose to recommend that the Commission consider enforcement proceedings. That is no "mandate," and it is certainly not "final agency action." *See, e.g.*, *Luminant Generation Co. v. EPA*, 757 F.3d 439, 441, 444 (5th Cir. 2014); *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1263 (D.C. Cir. 2018); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944–945 & n.6 (D.C. Cir. 2012).

Plaintiffs' cases are not on point. Dkt. 21 at 11–12. For instance, *Western Illinois Home Health Care, Inc. v. Herman* involved a Department of Labor staff letter communicating "the agency's"—not staff's—"'enforcement position'" and threatening "a follow-up investigation" and "steeper penalties for future violations." 150 F.3d 659, 662–663 (7th Cir. 1998). While the letter there also came from a subordinate official, which the court noted "might suggest tentativeness or lack of finality," that official was acting pursuant to "delegated powers within the Department" and thus "had the authority to make a decision binding on the recipient of his letter" pursuant to Department regulations. *See id.* at 663. None of those circumstances are present here. Even further afield is *Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019). That case did

---

[3] Plaintiffs, without directly quoting the August 4, 2022 withdrawal, mischaracterize it as providing that "private investors must be kicked out of their contracts by February 15, 2023, or enforcement action will follow." Dkt. 21 at 11. But the withdrawal does not say that. Nor is an "or else" threat implied by the word "should," as the withdrawal does not list any independent legal consequences for noncompliance with that grace period (as opposed to noncompliance with the at-all-times-applicable CEA and CFTC rules). Nor does DMO have the authority to impose independent legal consequences under Rule 140.99(a)(2). Only the Commission can authorize enforcement proceedings. *See* Dkt. 19 at 3–4 (citing 17 C.F.R. § 140.12). Indeed, the Commission has the power to do so at any time before, on, or after February 15, 2023.

not involve staff-level conduct at all, but rather a Title VII guidance document issued by the EEOC that was binding on both EEOC and its staff. *See, e.g.*, 933 F.3d at 445 ("[W]hether the agency action binds the *agency* indicates whether legal consequences flow from that action.").

While it is true that Rule 140.99(a)(2) no-action letters are "unappealable," *see* Dkt. 19 at 9, that is only one of several factors under the two-part *Bennett v. Spear* "final agency action" framework—and it makes no sense in this context. It would be absurd for the Commission to create appellate review for non-binding, staff statements about whether the issuing staff may "recommend enforcement action to the Commission."

### d. The Commission itself never "approved" either staff letter.

Plaintiffs briefly assert the August 4, 2022 withdrawal should be considered "final agency action" because, "on information and belief," DMO's letter was "approved by the Commissioners." Dkt. 21 at 9–10; Am. Compl. ¶ 77d. Plaintiffs imply that the Commission, in a deliberate effort to skirt judicial review, "assent[ed]" to DMO's position when the August 4, 2022 withdrawal letter was allegedly "circulated" to individual Commissioners and they declined to object. *See* Dkt. 21 at 10; Am. Compl. ¶ 77d.

But under the CEA, Commissioners other than the Chairman have no authority to approve or disapprove staff action such as DMO's letters: "[S]upervision of personnel employed by the Commission" is authority "exercised solely by the Chairman." 7 U.S.C. § 2(a)(6). This distinguishes a staff no-action letter from Commission action. The informal process of circulating a staff document to solicit objections, which would not bind the Chairman or staff in any event, is a courtesy that does not result in a vote, much less approval, of "the Commission itself." *See* 17 C.F.R. § 140.12(a)–(b) (requiring a "written record" of Commission votes outside of a full "Commission meeting"). The SEC similarly "declined to review the staff's position" in

*Kixmiller* and the D.C. Circuit explained that, as such, "what petitioner seeks to have reviewed in this court is not an 'order issued by the Commission.'"  492 F.2d at 643–644; *see also Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1132–33 (D.C. Cir. 2007) (holding that a "deadlocked" vote is not "action" of multimember agency that "acts by majority vote").

And in *Chicago Board of Trade*, the SEC "voted not to object to the Division's sending" the challenged no-action letter during "a public meeting" at which individual Commissioners made "comments" that "suggested a conclusion" that civil enforcement proceedings would be warranted.  883 F.2d at 529–530.  Nevertheless, the Seventh Circuit held that there was no "final agency action" in the absence of an SEC-authorized enforcement action or similar exercise of formally delegated authority.  *See id.* (characterizing divisional staff's no-action position as "tentative" because the issuing official "could change his mind tomorrow, or the Commissioners might elect to proceed no matter what the Director recommends").  Here there was no vote at all.

Plaintiffs do not dispute that Victoria University "long ago" could have, but did not, seek from the Commission formal approval to operate.  *Compare* Dkt. 21 at 10, 17, *with* Dkt. 19 at. 4–5 (citing 7 U.S.C. §§ 7(a), 7b-3(a)(1); 17 C.F.R. §§ 37.3, 38.3; 7 U.S.C. § 6(c)(1)–(2)).  Plaintiffs argue that, as a practical matter, "No-Action Relief was the *only* way" forward because the Commission had previously denied other registered entities' requests "to offer political futures contracts" and PredictIt's proposed operations would have to be restructured to be eligible for a Section 4(c) exemption.  Dkt. 21 at 10, 17.  In other words, Plaintiffs—remarkably—concede that the University never sought formal Commission approval because the University believed

7

the Commission would deny their request. But that belief, even if accurate, does not transform Rule 140.99(a)(2) into a vehicle "to obtain the CFTC's permission." Dkt. 21 at 17.

### e. Nor has the Commission "delegated" any "approval" authority to Staff issuing no-action letters.

Plaintiffs maintain that even if the Commission itself did not "approve" PredictIt's operations, DMO did so on the Commission's behalf pursuant to "delegated" authority. *See* Dkt. 21 at 15–16. But the only "delegated" authority Plaintiffs cite is Rule 140.99, *see, e.g.*, Dkt. 21 at 17, which merely codifies a preexisting staff practice of answering inquiries about what staff would "recommend … to the Commission" concerning proposed activities. *Requests for Exemptive, No-Action and Interpretive Letters*, 63 Fed. Reg. 3285, 3285 (Jan. 22, 1998). Rule 140.99(a)(2) clearly states that same limited effect of staff no-action letters, and that they are non-binding as to the Commission. 17 C.F.R. § 140.99(a)(2). That is no delegation.

### f. Staff no-action letters are not "Commission orders" with legal consequences.

Finally, Plaintiffs assert that while no actual sanctions have yet issued, the withdrawal still carries "legal consequences" in the form of "enhanced penalties for 'willful' violations of the Commodity Exchange Act." *See* Dkt. 21 at 14–15. While knowingly *violating the CEA* might expose the responsible parties to greater penalties, no such consequences could flow from either staff letter, which interpret no law and bind neither the Commission nor PredictIt.

Plaintiffs assert that the August 4, 2022 withdrawal is "no different" than the agency conduct in *Frozen Food Express v. United States*. Dkt. 21 at 15 (citing 351 U.S. 40 (1956)). Not so. *Frozen Food Express* involved an "order" of the Interstate Commerce Commission, not its staff, formally clarifying the legal status of certain exempt agricultural products that had "an immediate and practical impact" in that the newly announced interpretation "risk[ed]" new civil and criminal liability for "unauthorized operations." *See* 351 U.S. at 43–44. But the withdrawal

8

here lacks any novel legal interpretation, is not an "order" of any sort, and is expressly non-binding regardless.  *Compare id*. at 572, *with New York City Empls.' Ret. Sys. v. SEC*, 45 F.3d 7, 12 (2d Cir. 1995) (holding that no-action letters are non-binding "interpretive" policy statements that lack the force of law); *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723, 735 (S.D. Tex. 2010) (same).

The CEA and CFTC regulations alone "set forth" the "rights and obligations" governing PredictIt's operations and "adverse legal consequences will flow only if" a still-hypothetical enforcement action "determines" that those operations "violated the Act or" regulations, including the willfulness of such violations.  *See Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014).  Plaintiffs do not identify "any statutory provision or caselaw" requiring regulated entities to comply with the terms of no-action letters or allowing the CFTC to "impose penalties for 'violating'" them.  *See id.* at 443 & n.8; *see also* 7 U.S.C. § 13(5); 17 C.F.R. § 140.99.  Regardless, the responsible parties would "have a full opportunity" to raise any (mis-)understanding of the significance of no-action letters "as a defense to the enforcement action," should the Commission authorize one.  *Luminant Generation*, 757 F.3d at 444.

## II. Staff Decisions Whether To Recommend Enforcement Proceedings Are No Less "Committed To Agency Discretion By Law" Than Commission Decisions Authorizing Or Declining To Authorize Enforcement Proceedings.

As the Seventh Circuit alternatively held in *Chicago Board of Trade*, no-action letters also are unreviewable as "committed to agency discretion by law."  883 F.2d at 530 (citing 5 U.S.C. § 701(a)(2)).  A staff-level decision whether to recommend an enforcement action requires sensitive judgments about "the most constructive use of the Commission's resources."  *Id.* at 531.  Plaintiffs' argument that they are challenging only "the CFTC's decision to revoke its

9

authorization for the PredictIt Market," Dkt. 21 at 17, fails for the reasons above—there was no agency action at all. And the staff action at issue is unreviewable as a matter of law.

### III. The Amended Complaint Does Not Plausibly Allege Article III Standing.

Plaintiffs have failed to make the heightened showing required to press APA claims in non-party Victoria University's stead as to either causation or redressability. *See* Dkt. 19 at 18–20 (citing *Nat'l Wrestling Coaches Assoc. v. Dep't of Educ*. 366 F.3d 930, 944 (D.C. Cir. 2004)).[4] Plaintiffs argue that *National Wrestling* is distinguishable because the August 4, 2022 withdrawal "is causing" their alleged downstream harms as there is no "wriggle room" to continue operating PredictIt in "the shadow of the Revocation." Dkt. 21 at 20. Plaintiffs thus merely reiterate their mistaken characterizations of the August 4, 2022 withdrawal as a binding "mandate" that "revoked" an earlier "approval" issued by "[t]he CFTC" that carries independently adverse legal consequence. *See id.* at 19–20. Once again, that is wrong.

Plaintiffs conclude their standing discussion with the general proposition that, in appropriate circumstances, "a party impacted by agency action need not wait for sanctions to challenge an agency prescription of what must be done." *Id.* at 20 (citing *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016)). True enough. But *Hawkes* reaffirms that those appropriate circumstances require, among other things, "final agency action." 578 U.S. at 598 (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). And there is no final agency action here.

### CONCLUSION

For these reasons, the Court should grant the CFTC's motion to dismiss.

---

[4] Plaintiffs attached an unsworn letter from a Victoria University official to their preliminary-injunction briefing, and declined to submit a version that complies with 28 U.S.C. § 1746(1) in opposition to this motion. As such, they concede that this Court's standing analysis is a "facial, not factual" matter under Rule 12(b)(6)'s plausibility standard. Dkt. 21 at 19 (citing Dkt 18-2).

Respectfully submitted,

/s/ *Kyle M. Druding*

Robert A. Schwartz (D.C. Bar No. 489240)
  *General Counsel*
Anne W. Stukes (D.C. Bar No. 469446)*
  *Deputy General Counsel*
Kyle M. Druding (D.C. Bar No. 1044631)*
  *Assistant General Counsel*
U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC  20581
Phone:  (202) 418-6024
Fax:  (202) 418-5127
kdruding@cftc.gov


\* *Admitted* pro hac vice

**CERTIFICATE OF SERVICE**

    I certify that on November 21, 2022, I caused the foregoing Reply in Support of Defendant CFTC's Motion to Dismiss to be served on the Clerk of the Court using the Court's CM/ECF system, which will send notice to all counsel of record in this case.

                                                 /s/ *Kyle M. Druding*
                                                 Kyle M. Druding